**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

**NIRVANA, INC.,**

                              **Plaintiff,**

      **vs.**                                       **6:14-cv-01181**
                                                   **(MAD/ATB)**

**NESTLE WATERS NORTH AMERICA INC.,**

                              **Defendant.**

_____

| APPEARANCES: | OF COUNSEL: |
|---|---|
| **OFFICE OF RICHARD PERTZ** | **RICHARD PERTZ, ESQ.** |
| 12280 Rt. 365 | |
| Remsen, New York 13438 | |
| Attorneys for Plaintiff | |
| | |
| **MAYER BROWN LLP** | **ADAM L. HUDES, ESQ.** |
| 1999 K Street NW | **CARMINE R. ZARLENGA, III, ESQ.** |
| Washington, District of Columbia 20006 | **STEPHEN M. MEDLOCK, ESQ.** |
| Attorneys for Defendants | |
| | |
| **SMITH SOVIK KENDRICK &** | **KAREN G. FELTER, ESQ.** |
| **SUGNET, P.C.** | |

**Mae A. D'Agostino, U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

## I. INTRODUCTION

On August 20, 2014, Plaintiff commenced this suit in New York State Supreme Court of
Oneida County. *See* Dkt. No. 1-1. In the complaint, Plaintiff asserted violations of federal and
state antitrust laws as well as claims for breach of contract, tortious interference, unfair
competition, and trade disparagement, among other related claims. *See id.* On September 2,
2014, Plaintiff filed an amended summons and complaint. *See* Dkt. No. 1-2. On September 26,

2014, Defendant removed the action from the Supreme Court of the State of New York of Oneida County to this Court. *See* Dkt. No. 1. This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 based on the federal law violations alleged in the complaint. *See id*. This Court also has original jurisdiction pursuant to 28 U.S.C. § 1332 based on the diversity of the parties and the amount in controversy exceeds $75,000. *See id.* Defendant filed a motion to dismiss the complaint, *see* Dkt. No. 9-1, which was subsequently dismissed as moot because Plaintiff timely filed a first amended complaint (the "complaint") on November 30, 2014. *See* Dkt. Nos. 15; 20.

Currently before the Court is Defendant's motion to dismiss Plaintiff's first amended complaint for failure to state a claim upon which relief can be granted under Rule 12(b)(6) of the Federal Rules of Civil Procedure. *See* Dkt. No. 23.

## II. BACKGROUND

Plaintiff is a New York corporation with its corporate headquarters in Forestport, New York. *See* Dkt. No. 15 at ¶ 1. Plaintiff's business is the bottling and distribution of unflavored, still, natural spring water that is collected from its property located in the foothills of the Adirondack Mountains. *See id.* at ¶¶ 1, 17. Defendant is a Delaware corporation that maintains its corporate headquarters in Stamford, Connecticut. *See id.* at ¶ 2. Defendant is the largest distributor of "bottled water in the United States," according to Plaintiff's complaint. *See id*. Plaintiff and Defendant are direct competitors in the market for "bottled spring water in the northeastern United States," and both parties engage in interstate commerce by selling and shipping to "New York, New Jersey, Connecticut, Pennsylvania and Massachusetts." *See id.* at ¶ 3.[1]

---

[1] Plaintiff refers to these five states as the "northeastern United States" without any justification for that definition. *See* Dkt. No. 15 at ¶ 16. Plaintiff does not definitely state in the complaint that it sells and ships water to only these five states, but it indicates that Plaintiff does

In or about 2005, Plaintiff packaged its own water under one of Defendant's labels, a practice called co-packaging, and, later that year, Defendant made an oral offer to purchase Plaintiff, but the offer was declined. *See id.* at ¶¶ 19, 20. During the period from 2005 through 2011, a majority of Plaintiff's product was co-packed bottled water under other companies' labels. *See id.* at ¶ 22. According to Plaintiff, for this reason, it was not a significant competitor to Defendant during this time. *See id*. at ¶ 22. However, in 2011, Plaintiff introduced its own self-branded water and was taking market share from Defendant's labels, which included brands such as Poland Spring and Deer Park. *See id.* at ¶ 22. During that same year, Defendant approached Plaintiff again about a potential buyout. *See id.* at ¶ 23. Executives of the two companies met at Defendant's headquarters in Connecticut and entered into a non-disclosure agreement dated February 20, 2012, agreeing to not disclose or discuss the potential transaction or the terms, conditions, or other facts related to the potential transaction. *See id.* at ¶ 24.

Defendant then visited and researched Plaintiff's buildings, springs, and facilities. *See id.* at ¶ 25. Defendant also requested to see complete financial information from the years 2011 through 2013 as well as projected financial information for 2014 and 2015. *See id.* at ¶ 25. Upon Plaintiff's information and belief, during this same period of time, Defendant disclosed to Plaintiff's commercial customers that Defendant planned to purchase Plaintiff and showed these customers a letter from Plaintiff to Defendant indicating a desire to sell out in the face of financial difficulties. *See id.* at ¶ 30. As a result of this disclosure and related rumors, Plaintiff alleges that wholesale buyers and supermarket retailers ceased purchasing from Plaintiff. *See id.* at ¶ 31.

---

not account for all states of competition in every allegation of the complaint. *See* Dkt. No. 15 at ¶ 46.

Plaintiff also claims that, in 2011, Defendant entered into an "exclusive dealing contract" with Stew Leonard, a supermarket company, by paying Stew Leonard a sum of money to stop carrying Plaintiff's water. *See id.* at ¶ 32. Plaintiff states that Stew Leonard abruptly stopped purchasing from Plaintiff. *See id.* It is alleged in the complaint that, in 2014, Defendant paid another supermarket company, A&P, a sum of money to remove Plaintiff from its promotional calendar. *See id.* at ¶ 34. These supermarket promotions sold certain brands of bottled water at reduced prices for certain periods of time, and Plaintiff claims that its removal from the promotional calendar caused its sales to fall. *See id.* at ¶¶ 33-35. Plaintiff submits that its market share of bottled water at the A&P supermarkets was reduced from 30% in the Fall of 2012 to 5% in the Fall of 2014 compared to Defendant's market share of bottled water at the A&P supermarkets, which increased from 40% to 70% during that same period. *See id.* at ¶ 37.

Plaintiff also claims that Defendant charged a higher price to its commercial buyers, who also purchased water from Plaintiff, as compared to its commercial buyers of water that did not purchase from Plaintiff. *See id.* at ¶ 38. Plaintiff alleges that Defendant's practice was to incentivize these commercial buyers to not purchase Plaintiff's product. *See id.* Except for Dave's Market, these commercial buyers are not identified by Plaintiff. *See id.* Plaintiff also makes generalized allegations that Defendant offered these types of incentives to "other supermarkets" that Plaintiff was attempting to sell to. *See id.* at ¶ 39. Plaintiff specifically claims that, in 2011, Defendant offered Dave's Market "a better price" for their water in exchange for not carrying Nirvana and, as a result, Dave's Market stopped carrying Plaintiff's product. *See id.* at ¶ 38. According to Plaintiff, Defendant has moved or cause to have moved Plaintiff's bottled water to be less visible in the retail stores, and Defendant had also asked A&P to removed Plaintiff's product from the shelves entirely. *See id.* at ¶¶ 36, 42.

Plaintiff states that "[a]s the price of [Defendant's] bottled water fell relative to the price of [Plaintiff's] bottled water, demand for [Plaintiff's bottled water] fell." *Id.* at ¶ 41. Plaintiff claims that its sales have "fallen dramatically, in part because of [Defendant's] predatory and discriminatory pricing, insistence of exclusivity, and other anti-competitive practices." *Id.* at ¶ 43. The alleged injury to competition, according to the complaint, can be inferred from the changes in the market shares of Plaintiff and Defendant in six regional supermarket chains. Plaintiff acknowledges that the sales data and market share information of Plaintiff and Defendant, as alleged in the complaint, do not account for "all sales of bottled water in every venue in every state where the two companies sell natural spring water" but claims that the sales are "an accurate statistical sample and reflect the anti-competitive effects of [Defendant's] conduct on the market, and the degree to which [Defendant] has foreclosed competition from other brands." *See id.* at ¶ 46.

In the complaint, Plaintiff alleges the following causes of action:

1.      violation of section 2(a) of the Robinson-Patman Act, 15 U.S.C. § 13(a),

2.      violation of section 2(c) of the Robinson-Patman Act, 15 U.S.C. § 13(c),

3.      violation of section 3 of the Clayton Act, 15 U.S.C. § 14,

4.      violation of New York State Donnelly Act, N.Y. General Business Law § 340,

5.      common law claim for tortious interference,

6.      common law claim for unfair competition, and

7.      common law breach of contract claim.

*See id.* at ¶¶ 53-71.

Presently before the Court is Defendant's motion to dismiss Plaintiff's seven causes of action for failure to state claims upon which relief can be granted pursuant to section 12(b)(6) of the Federal Rules of Civil Procedure. *See* Dkt. No. 23.

### III. DISCUSSION

**A.      Standard of review**

"Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the claim is and the grounds upon which it rests.'" *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 55 U.S. 41, 47 (1957)).  A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the legal sufficiency of the party's claim for relief.  *See Patane v. Clark*, 508 F.3d 106, 111-12 (2d Cir. 2007).  "[T]he Supreme Court rejected the 'oft quoted' standard . . . that a complaint should not be dismissed, 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitled him to relief,'" *Li Xi v. Apple, Inc.*, 603 F. Supp. 2d 464, 467 (E.D.N.Y. 2009) (quoting *Conley*, 355 U.S. at 45-46), and, instead, held that a plaintiff must "plead enough facts 'to state a claim to relief that is plausible on its face.'" *Id.* at 467 (quoting *Twombly*, 550 U.S. at 555).  Although detailed factual allegations are not required in a pleading, a plaintiff must provide the grounds for their entitlement to relief.  *See Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

When considering whether a complaint has facial plausibility, that is to say that a plaintiff has "nudged their claims across the line from conceivable to plausible," a court must accept as true all well-pleaded facts in the complaint.  *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 508, n.1 (2002); *see also Twombly*, 550 U.S. at 570; *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d

87, 98 (2d Cir. 2007) (citation omitted). This presumption of truth, however, does not extend to legal conclusions. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). The Court "should not credit 'mere conclusory statements' or 'threadbare recitals of the elements of a cause of action'" as well-pleaded facts because they "do not suffice." *Coalition for a Level Playing Field, L.L.C. v. AutoZone, Inc.*, 737 F. Supp. 2d 194, 215 (S.D.N.Y. 2010) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009) and *Twombly*, 550 U.S. at 555). Further, "the Court must also determine whether [the creditable facts] plausibly suggest an entitlement to relief." *AutoZone, Inc.*, 737 F. Supp. 2d at 215. Ultimately, when the allegations in a complaint, however true, could not raise a claim of entitlement to relief, the complaint must be dismissed. *See Twombly*, 550 U.S. at 558, 570.

**B.    Analysis**

Plaintiff contends that Defendant violated federal and state anti-trust laws when Defendant engaged in aggressive competitive actions with the intention to lessen competition. *See* Dkt. No. 15 at ¶¶ 53-64. Specifically, Plaintiff alleges that Defendant has violated section 2(a) of the Robinson-Patman Act by selling its bottled water at higher prices to its commercial buyers, who also purchased Plaintiff's bottled water, and by giving incentives to its commercial buyers, who *do not* purchase Plaintiff's bottled water. *See* Dkt. No. 15 at ¶ 38. Next, Plaintiff claims that Defendant violated section 2(c) of the Robinson-Patman Act when it paid a sum of money to Stew Leonard to stop carrying Plaintiff's water. *See id.* at ¶¶ 32-36, 53-64. Plaintiff is also claiming that the sum of money paid to A&P in exchange for removing Plaintiff from that supermarket's promotional calendar violated section 2(c) of the Robinson-Patman Act. *See id.* at ¶¶ 33-34, 38-39. In Plaintiff's view, presumably the payment to Stew Leonard and A&P were commercial bribes, in violation of section 2(c) of the Robinson-Patman Act.

Plaintiff further claims that the agreement with Stew Leonard and the agreement with Dave's Market were both violations of the Donnelly Act, as unlawful exclusive dealing agreements, because these agreements imposed an unreasonable restraint on trade. *See* Dkt. Nos. 15 at ¶¶ 62-64; 25 at 8-9. In addition to the antitrust claims, Plaintiff also brings claims based upon New York common law, including tortious interference with Plaintiff's prospective business relations, unfair competition, and breach of contract relating to the non-disclosure agreement.

### 1. Antitrust Standing

Section 4 of the Clayton Act creates a private right of action for those injured as a result of any federal antitrust law violation. *See* 15 U.S.C. § 15 (providing that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue . . . without respect to the amount in controversy, and shall recover threefold the damages by him sustained"); *Gatt Commc'n, Inc. v. PMC Asscs., L.L.C.*, 711 F.3d 68, 75 (2d Cir. 2013); *Genesco, Inc. v. T. Kakiuchi & Co.*, 815 F.2d 840, 853 (2d Cir. 1987). Antitrust violations can cause "ripples of harm" throughout an economy. *See Associated Gen. Contractors of Cal., Inc. v. California State Council of Carpenters,* 459 U.S. 519, 534 (1983) (internal quotation marks and citations omitted). "[H]owever, 'Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation.'" *Gatt*, 711 F.3d at 75 (quoting *Contractors of Cal.,* 459 U.S. at 534). As a result, "limiting contours" have developed and "are embodied in the concept of 'antitrust standing.'" *Gatt*, 711 F.3d at 75 (quoting *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 436-38 (2d Cir. 2005)).

Antitrust standing is a threshold determination to be addressed at the pleading stage, and "when a complaint by its terms fails to establish this requirement," the complaint must be dismissed as a matter of law. *See Gatt*, 711 F.3d at 75; *NicSand, Inc. v. 3M Co.*, 507 F.3d 442,

450 (6th Cir. 2007) (stating that antitrust standing prevents the antitrust laws from becoming "a treble-damages sword rather than the shield against competition-destroying conduct that Congress meant them to be"). To establish that a plaintiff has antitrust standing to bring a private cause of action under an antitrust statute, there are several factors that are considered, which the Second Circuit has "distilled . . . into two imperatives." *See Gatt*, 711 F.3d at 76. First, a private antitrust plaintiff must plausibly allege that "it suffered a special kind of antitrust injury," and, second, that it is an "efficient enforcer" of the antitrust laws, meaning that the plaintiff is suited "to pursue the alleged antitrust violations." *Gatt*, 711 F.3d at 76 (internal quotation marks omitted) (citing *Port Dock & Stone Corp. v. Oldcastle Northeast, Inc.*, 507 F.3d 117, 121-22 (2d Cir. 2007); *see also Associated Gen. Contractors*, 459 U.S. at 537-45.

The sufficiency of a plaintiff's alleged antitrust injury is analyzed in a three-step process, which requires the courts to (1) identify the anticompetitive practice complained of "and the reasons such a practice is or might be anticompetitive;" (2) identify the actual injury alleged by a plaintiff; and (3) "compar[e] the anticompetitive effect of the specific practice at issue to the actual injury the plaintiff alleges." *Gatt*, 711 F.3d at 76 (internal quotation marks and citations omitted). Antitrust standing is not established "merely by showing injury causally linked to an illegal presence in the market;" but "[i]nstead, a plaintiff must prove the existence of antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flow from that which makes defendants' acts unlawful." *Blue Tree Hotels, Inc. v. Starwood Hotels Investment (Canada), Ltd.*, 369 F.3d 212, 220 (2d Cir. 2004) (internal quotation marks omitted) (quoting *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990) (quoting *Brunswich Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1997))).

In this case, Plaintiff's complaint has plausibly stated antitrust injury for each of its antitrust claims. Plaintiff's discriminatory pricing claim, in violation of section 2(a) of the Robinson-Patman Act, alleges that Defendant charged a higher price to commercial buyers who also purchased Plaintiff's bottled water as compared to commercial buyers who did not. *See* Dkt. No 15 at ¶¶ 38-39. As a result, Dave's Market stopped purchasing from Plaintiff. *See id.*. Plaintiff claims that Defendant unlawfully bribed commercial buyers, in violation of section 2(c) of the Robinson-Patman Act, when it paid money to A&P and Stew Leonard's in exchange for removing Plaintiff from the promotional calendar and discontinue carrying Plaintiff's water, respectively. *See id.* at ¶¶ 32, 34. Plaintiff's complaint describes that Defendant entered into exclusive dealing agreements with Dave's Market and Stew Leonard's in violation of section 3 of the Clayton Act. Plaintiff also claims that Defendant violated New York's Donnelly Act by making exclusive dealing agreements, whereby competition was restrained. *See id.* at ¶¶ 62-64. Each of these alleged practices by Defendant plausibly states an anticompetitive practice in violation of an antitrust statute.

As a result of each of these practices, Plaintiff claims that it suffered an actual injury, a significant decrease in its sale revenues. *See id.* at ¶ 43. This plausibly states a worse position that Plaintiff is in as a result of the identified anticompetitive practices, in satisfaction of the second step. *See DNAML PTY, Ltd. v. Apple Inc.*, 25 F. Supp. 3d 422, 428 (S.D.N.Y. 2014) (finding that the plaintiff satisfied step two of the analysis by stating its actual injury was the loss of the profits it hoped to achieve). Plaintiff's lost revenues are the type of injury that the antitrust laws were intended to prevent and Plaintiff's injuries also flow from Defendant's alleged unlawful acts. Plaintiff has alleged more than a mere causal link but has factually set forth that it was the

specific target of Defendant's alleged anticompetitive practices and that Defendant intended to it drive out of business.  *See* Dkt. No. 15 at ¶ 29.

To determine whether a plaintiff is an "efficient enforcer" of the antitrust laws – in satisfaction of the second imperative to antitrust standing, the courts must examine the following factors:

> (1) the directness or indirectness of the asserted injury;
>
> (2) the existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement;
>
> (3) the speculativeness of the alleged injury; and
>
> (4) the difficulty of identifying damages and apportioning them among direct and indirect victims so as to avoid duplicative recoveries.

*Gatt*, 711 F.3d at 78 (internal quotation marks omitted) (quoting *Paycom Billing Servs., Inc. v. Matercard Int'l*, 467 F.3d 283, 290-91 (2d Cir. 2006)) (noting that the weight assigned to each of these factors will vary with the facts of each case).  Upon review of the pleaded facts in the complaint and examination of the "efficient enforcer" factors, the Court finds that Plaintiff is a suitable plaintiff to bring these antitrust claims.

Directness, as it is referred to in this context, "means close in the chain of causation."  *Id.* "This is essentially a proximate cause analysis and asks 'whether the harm alleged has a sufficiently close connection to the conduct the statute prohibits.'"  *See DNAML PTY*, 25 F. Supp. 2d at 430 (internal quotation marks and citations omitted).  The lost revenue alleged here is a direct injury under this analysis because, as discussed above, Plaintiff alleges that it was the specific target of Defendant's actions.  *See* Dkt. No. ¶¶ 32-34, 38-39, 42.  The injury sustained was the injury intended as described by Plaintiff.  *See id.*  Defendant's alleged actions do not

implicate a class of potential plaintiffs, and the injury, a sustained loss of sales revenue due to lost customers, which was identified in the complaint, is not speculative. Finally, there is no potential for duplicative recoveries because the unlawful acts complained of here were designed to harm Plaintiff specifically.

The Court, after analyzing Plaintiff's complaint under the three-step process to determine antitrust injury and the four factors to determine "efficient enforcer" status, concludes that Plaintiff has established antitrust standing. It should be noted that this standing analysis is equally applicable to Plaintiff's Donnelly Act claim. *See Gatt*, 711 F.3d at 81-82; *Yong Ki Hong v. KBS Am., Inc.*, 951 F. Supp. 2d 402, 419-20 (E.D.N.Y. 2013).

### 2. Sections 2(a) of the Robinson-Patman Act

Plaintiff claims that Defendant violated section 2(a) the Robinson-Patman Act through its use of discriminatory pricing. *See* Dkt. No. 15 at ¶¶ 53-55. Although Plaintiff alleges that Defendant offered "a better price" to its commercial buyers who did not also purchase Plaintiff's bottled water than its commercial buyers who did purchase Plaintiff's bottled water, Plaintiff only specifically identifies Dave's Markets as one of those commercial buyers. *See id.* at ¶¶ 38-39. Defendant argues that Plaintiff has failed to plead the elements of a claim under section 2(a) of the Robinson-Patman Act. *See* Dkt. No. 23-2 at 11-12.

The predatory practice of deliberately selling below cost to drive a competitor out of business is prohibited by the federal anti-trust statutes – the Sherman Act, 15 U.S.C. § 2, and the Clayton Act, as amended by, the Robinson-Patman Act, 15 U.S.C. § 13(a). *See Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 219-22 (1993) (stating that the essence of a section 2(a) claim under the Robinson-Patman Act is that "[a] business rival has priced its products in an unfair manner with an object to eliminate or retard competition and thereby gain

and exercise control over prices in the relevant market").  Both anti-trust statutes require sales

below cost and anticompetitive intent, *see id.* at 251 (Stevens, J., dissenting), but "the Robinson-

Patman Act requires only that there be 'a reasonable possibility' of substantial injury to

competition before its protections are triggered" as compared to the Sherman Act that condemns

"predatory pricing when it poses 'a dangerous probability of actual monopolization.'" *See id.* at

222.

Section 2(a) of the Robinson-Patman Act states that

> It shall be unlawful for any person engaged in commerce, in the
> course of such commerce, either directly or indirectly, to
> discriminate in price between different purchasers of commodities
> of like grade and quality . . . where the effect of such discrimination
> may be substantially to lessen competition or tend to create a
> monopoly in any line of commerce, or to injury, destroy, or prevent
> competition with any person who either grants or knowingly
> receives the benefit of such discrimination, or with customers of
> either of them.

15 U.S.C. § 13(a).  In order to trigger the protection of the Robinson-Patman Act, a plaintiff must

allege a price discrimination that threatens injury to competition because mere price differences

charged to different purchasers for the same product are not banned.  *See Brooke Group Ltd.*, 509

U.S. at 220 ("Congress did not intend to outlaw price differences that result from or further the

forces of competition.").

There are "three categories of competitive injury that may give rise to a Robinson-Patman

Act claim: primary line, secondary line, and tertiary line." *Volvo Trucks N. Am. v. Reeder-Simco

GMC, Inc.*, 546 U.S. 164, 176 (2006).  Primary-line injury involves harm to direct competitors of

the discriminating seller through conduct, "most conspicuously, predatory pricing," which is the

type of injury at issue in this case. *See Volvo Trucks*, 546 U.S. at 176 (citing *Brooke Group Ltd.*,

509 U.S. at 220-22).  Secondary-line injury involves price discrimination that injures competition

among the discriminating seller's buyers. *See Volvo Trucks*, 546 U.S. at 176. And, tertiary-line injury involves injury to competition at the level of the purchaser's customers.[2] *See id.*

To establish a price discrimination claim based upon primary-line injury under section 2(a) of the Robinson-Patman Act, Plaintiff had to show that (1) Defendant's bottled water sales were made in interstate commerce; (2) the bottled water was of like grade and quality; (3) Defendant discriminated in price between a favored purchaser and a disfavored purchaser; and (4) this price discrimination threatened substantial competitive injury. *See* 15 U.S.C. § 13(a); *Brooke Group, Ltd.*, 509 U.S. at 219-20; *John B. Hull, Inc. v. Waterbury Petroleum Prods., Inc.*, 588 F.2d 24, 26 (2d Cir. 1978). "[P]rimary-line competitive injury under the Robinson-Patman Act is of the same general character as the injury inflicted by predatory pricing schemes actionable under § 2 of the Sherman Act." *See Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312, 318, n.1 (2007); *Brooke Group, Ltd.*, 509 U.S. at 221.

Whether under the Sherman Act or the Robinson-Patman Act, predatory pricing schemes have two prerequisites to recovery that must be pleaded to establish a threat to substantial competitive injury. *See Brooke Group Ltd.*, 509 U.S. at 221. "First, a plaintiff seeking to establish competitive injury resulting from a rival's low prices must prove that the prices complained of are below an appropriate measure of its rival's costs." *See id.* at 224 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585, n.8 (1986)). Those prices

---

[2] "A hallmark of the requisite competitive injury [in secondary-line cases]. . . is the diversion of sales or profits from a disfavored purchaser to a favored purchaser" of a discriminating seller. *Volvo Trucks*, 546 U.S. at 177. Therefore, the disfavored purchaser and favored purchaser must be in direct competition with one another. *See G.L.M. Sec. & Sound, Inc. v. LoJack Corp.*, No. 10-CV-4701, 2012 WL 4512499, *11 (E.D.N.Y. Sept. 28, 2012). In tertiary-line cases, the customers of the favored and disfavored purchasers can show their injury through diverted sales; but, however, the favored and disfavored purchasers do not have to be direct competitors. *See Falls City Indus., Inc. v. Vanco Beverage, Inc.*, 460 U.S. 428, 437-38 (1983); *G.L.M. Sec. & Sound, Inc.*, 2012 WL 4512499, at *11.

that are above an appropriate measure of a rival's costs "reflect[] the lower cost structure of the alleged predator," and those above cost prices also "represent[] competition on the merits."[3] *See Weyerhaeuser Co.,* 549 U.S. at 319 (2007) (quoting *Brooke Group Ltd.*, 509 U.S. at 223) (declining "to allow plaintiffs to recover for above-cost price cutting, concluding that 'discouraging a price cut and . . . depriving consumers of the benefits of lower prices . . . does not constitute sound antitrust policy").

"The second prerequisite to holding a competitor liable under the antitrust laws for charging low prices is a demonstration that the competitor had a reasonable prospect . . . of recouping its investment in below-cost prices." *Brooke Group Ltd.*, 509 U.S. at 224 (citing *Matsushita*, 475 U.S. at 589). "Recoupment is the ultimate object of an unlawful predatory pricing scheme; it is the means by which a predator profits from predation. Without it, predatory pricing produces lower aggregate prices in the market, and consumer welfare is enhanced." *See Brooke Group, Ltd.*, 509 U.S. at 224.

As explained by the Supreme Court these two prerequisites are necessary because, "[c]utting prices in order to increase business often is the very essence of competition." *Pac. Bell Tel. Co. v. Linkline Commc'n, Inc.*, 555 U.S. 438, 451 (2009) (internal quotation marks omitted) (quoting *Matsushita*, 475 U.S. at 594); *Brooke Group, Ltd.*, 509 U.S. at 226. Improperly imposing liability for prices that are too low will "chill the very conduct the antitrust laws are

---

[3] In the Second Circuit, the appropriate measure of cost in predatory pricing cases is average variable cost, as a surrogate for marginal cost, because marginal cost cannot be determined from conventional accounting methods. *See Northeastern Tel. Co. v. Am. Tel. and Tel. Co.*, 651 F.2d 76, 88 (2d Cir. 1981) (adopting marginal cost as the appropriate measure of cost in predatory pricing cases). "Marginal cost is the increment to total cost that results from producing an additional increment of output. It is a function solely of variable costs. . . . Marginal cost usually decreases over low levels of output and increases as production approaches plant capacity." Phillip Areeda and Donald F. Turner, Predatory Pricing and Related Practices Under Section 2 of the Sherman Act, 88 HAR. L. REV. 697, 700 (1975).

designed to protect." *Weyerhaeuser Co.*, 549 U.S. at 320 (internal quotation marks and citations omitted) (quoting *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 121, n.17 (1986).

In the present case, Plaintiff has neither pleaded facts that support nor alleged the two essential components of a predatory pricing scheme. Specifically, Plaintiff does not alleged that Defendant priced and sold its bottled water at a level below its average variable cost – or at a level below any level of cost. Upon a reading of Plaintiff's complaint, the Court finds that Plaintiff has also failed to allege that Defendant had a reasonable prospect of recouping its investment in below-cost pricing. Plaintiff pleaded that Defendant had the intent to harm them with aggressive, competitive acts, but these facts, taken as true, do not state a claim for price discrimination under section 2(a) of the Robinson-Patman Act. "Even an act of pure malice by one business competitor against another does not, without more, state a claim under the federal antitrust laws; those laws do not create a federal law of unfair competition or 'purport to afford remedies for all torts committed by or against persons engaged in interstate commerce.'" *Brooke Group Ltd.*, 509 U.S. at 225 (quoting *Hunt v. Crumboch*, 325 U.S. 821, 826 (1945)). "It is axiomatic that the antitrust laws were passed for 'the protection of *competition*, not *competitors.*'" *Brooke Group Ltd.*, 509 U.S. at 224 (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962).

### 3. Section 2(c) of the Robinson-Patman Act

Plaintiff contends that Defendant violated section 2(c) of the Robinson-Patman Act, 15 U.S.C. § 13(c), by paying Stew Leonard and A&P a sum of money in exchange for not purchasing Plaintiff's bottled water and excluding Plaintiff from the promotional calendar, respectively. *See* Dkt. No. 15 at ¶¶ 32-34, 56-58. Defendant argues that this section was only

intended to address the practice of "dummy brokerages."[4]  *See* Dkt. No. 23-3 at 22-23.  According to Defendants, because Plaintiff has no allegations involving a brokerage arrangement, this claim should be dismissed.  Section 2(c) of the Robinson-Patman Act states that

> [i]t shall be unlawful for any person engaged in commerce, in the course of such commerce, to pay . . . anything of value as a commission, brokerage, or other compensation, or any allowance or discount in lieu thereof, except for services rendered in connection with the sale or purchase of goods, wares, or merchandise, either to the other party to such transaction or to an agent, representative, or other intermediary therein where such intermediary is acting in fact for or in behalf, or is subject to the direct or indirect control, of any party to such transaction other than the person by whom such compensation is so granted or paid.

15 U.S.C. § 13(c).  The Second Circuit, quoting Justice Frankfurter, stated that "precision of expression is not an outstanding characteristic of the Robinson-Patman Act," s*ee Blue Tree Hotels*, 369 F.3d at 218 (internal quotation marks omitted) (quoting *Automatic Canteen Co. of Am. v. FTC*, 346 U.S. 61, 65 (1953), before parsing out section 2(a) claims as follows:

> It is unlawful for any person to
> (1) pay (or receive)-
>     a. anything of value as a commission, brokerage, or other compensation, *or*
>     b. any allowance or discount in lieu of brokerage, *except* for services rendered in connection with a sale or purchase of goods,
> (2) when the payment is made to (or by)
>     a. the other party to the transaction, or
>     b. an agent, representative or other intermediary where the intermediary is
>         (i) acting for or in behalf of, or
>         (ii) subject to the direct or indirect control of

---

[4] The practice of "dummy brokerages" occurred when "large retail buying groups – such as large grocery store chains, which, unlike smaller stores, did not need to use intermediary brokers to purchase their merchandise – would require suppliers to pay fees to "dummy brokers," who then passed the fees on to the large retailer, effectively reducing the price the retailer paid for the goods."  *Blue Tree Hotels*, 369 F.3d at 221.

any party to the transaction other than the person by whom the compensation is paid.

*Id.*

Indeed, Defendant is correct that section 2(c) was primarily enacted to prevent the practice of "dummy brokerages," *see Blue Tree Hotels*, 369 F.3d at 221, but the courts have found that Congress intentionally drafted broad language in this section to also cover other methods by which brokerage fees could be used to effect price discrimination in the form of payment or discount. *See Am. Fed'n of State, Cty. & Mun. Emps. Dist. Council 37 Health & Sec. Plan v. Bristol-Myers Squibb Co.*, 948 F. Supp. 2d 338, 357 (S.D.N.Y. 2013) (citing *World Wrestling Entm't, Inc. v. Jakks Pac., Inc.*, 425 F. Supp. 2d 484, 502 (S.D.N.Y. 2006). Here, Plaintiff does not make out a prima facie case even giving a broader interpretation to this section because there are no allegations of agents, fiduciaries, or brokerage fees within Plaintiff's complaint.

"Some courts, applying § 2(c) to circumstances far removed from the paradigmatic 'dummy brokerage' scheme, have held that § 2(c) also proscribes commercial bribery." *Blue Tree Hotels*, 369 F.3d at 221 (collecting cases in which commercial bribery was found to be a violation of section 2(c) of the Clayton Act). The Second Circuit has not yet determined whether commercial bribery is prohibited by the Robinson-Patman Act. However, as in other cases, this Court need not reach this determination here because "a necessary requirement for stating such a claim would be allegations sufficient to establish commercial bribery," *id.* at 221 (citing *Excel Handbag Co. v. Edison Bros. Stores, Inc.*, 630 F.2d 379, 387-88 (5th Cir. 1980), which Plaintiff has failed to do.

"The essence of commercial bribery is the corruption of the duty that an agent owes his principal;" and, therefore, in order for commercial bribery to be "within the reach" of section 2(c), a plaintiff must allege that a person, who purports to be an agent for – or maintains a fiduciary

duty to – one party to a transaction, receives "for his own account and contrary to the interests of his principal[] commissions or payments from the other party to the transaction." *Bristol-Myers Squibb Co.*, 948 F. Supp. 2d at 357. Accordingly, "[t]o the extent that section 2(c) prohibits bribery, it prohibits 'cases of commercial bribery involving a breach of a fiduciary duty by the buyer's agent.'" *United Magazine Co. v. Murdoch Magazines Distribution, Inc.*, 146 F. Supp. 2d 385, 397 (S.D.N.Y. 2001) (quoting *Phillips Morris, Inc. v. Grinnelle Lithographic Co.*, 67 F. Supp. 2d 126, 131 (E.D.N.Y. 1999). The payment of a sum of money from Defendant to a supermarket, as alleged by Plaintiff, does not implicate an agent, a fiduciary duty, or a breach of fiduciary duty. Accordingly, Plaintiff has not sufficiently pleaded a commercial bribery or, in turn, a potential claim under section 2(c) of the Clayton Act.

### 4. Exclusive Dealing Agreements

Plaintiff alleges in its third claim alleges that Defendant has violated section 3 of the Clayton Act, 15 U.S.C. § 14, ("section 3 of the Clayton Act") prohibiting exclusive dealing agreements. *See* Dkt. No. 15 at ¶ 32. Presumably, Plaintiff is alleging that Defendant's payment to Stew Leonard, a supermarket company, and Defendant's discounted price to Dave's Markets, both in exchange for not purchasing Plaintiff's bottled water, were unlawful exclusive dealing agreements. *See id.* at ¶¶ 32, 59-61. In opposition, Defendant argues that plaintiff did not sufficiently plead a relevant market or substantial foreclosure of competition in the relevant market. *See* Dkt. No. 23-3 at 24-29. The Court agrees with Defendant.

In relevant part, section 3 of the Clayton Act, 15 U.S.C. § 14, prohibits the sale or contract for sale of goods on the condition, agreement, or understanding that the buyer will not use or deal in the goods of the seller's competitor where the effect of the sale may be to substantially lessen competition. Even if the contract for the sale of goods does not contain an explicit term to not use

the goods of a competitor, "it comes within the condition of the section as to exclusivity" when "the practical effect is to prevent such use."  *See Tampa Elec. Co. v. Nashvill Coal Co.*, 365 U.S. 320, 326 (1961).  Exclusive dealing agreements are not, standing alone, a violation of section 3 of the Clayton Act.  *See Tampa*, 365 U.S. at 327; *Xerox Corp. v. Media Scis. Int'l, Inc.*, 511 F. Supp. 2d 372, 389 (S.D.N.Y. 2007).  To state a violation, the exclusive dealing agreement must foreclose competition in a substantial share of the relevant market.  *See Tampa*, 365 U.S. at 327-29; *Xerox*, 511 F. Supp. 2d at 389-90 ("Where a substantial share of the market is foreclosed, competing manufacturers and new entrants will be unable to find outlets for their products."); *Commercial Data Servers v. Int'l Bus. Machs. Corp.*, 262 F. Supp. 2d 50, 75 (S.D.N.Y. 2003).

The Supreme Court provided guidelines with three considerations to determine if an exclusive dealing agreement violates section 3 of the Clayton Act.  *See Tampa*, 365 U.S. at 327-29.  First, the line of commerce must be defined, meaning "the type of goods."  *See id.* at 327.  "Second, the area of effective competition in the known line of commerce must be charted by careful selection of the market area in which the seller operates, and to which the purchaser can practicably turn for supplies."  *Id.*  These first two considerations describe the "relevant market" which is "the area of effective competition" because it is that "proportion of coverage" which needs to be considered in protecting competition.  *Id.* at 328 (citing *Standard Oil of Cal. and Standard Sol., Inc. v. United States*, 337 U.S. 293, 299 (1949)).  "[T]he threatened foreclosure of competition must be in relation to the market affected."  *Id.* at 327 ("It is clear, of course, that the line of commerce affected need not be nationwide, at least where the purchasers cannot, as a practical matter, turn to suppliers outside their own area." (internal quotation marks omitted) (citing *Standard Oil*, 337 U.S. at 299)).

The final consideration is whether "the competition foreclosed by the contract" makes up a "substantial share of the relevant market." *Id.* at 328 ("That is to say, the opportunities for other traders to enter into or remain in that market must be significantly limited."). The substantiality of the relevant market in a given case is determined by weighting "the probable effect of the contract on the relevant area of effective competition, taking into account the relative strength of the parties, the proportionate volume of commerce involved in relation to the total volume of commerce in the relevant market area" as well as "the probable immediate and future effects which pre-emption of that share of the market might have on effective competition therein." *Id.* at 329. Ultimately, "the relevant market is the prime factor" in determining whether a "contract forecloses competition in a substantial share of the line of commerce involved." *Id.* at 329.

The relevant market "must include all products 'that have reasonable interchangeability for the purpose for which they are produced – price, use and qualities considered.'" *Commercial Data Servers*, 262 F. Supp. 2d at 63 (quoting *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 404 (1956)). The cross-elasticity of demand, meaning that, in response to an increase in price, consumers of one product will respond by purchasing another, must also be considered. *See id.* (citing *AD/SAT, a Div. of Skylight, Inc. v. Associated Press*, 181 F.3d 216, 227 (2d Cir. 1999). The failure to properly plead a relevant market is fatal to a plaintiff's claim at the motion to dismiss stage. *See Todd v. Exxon Corp.*, 275 F.3d 191, 200 (2d Cir. 2001)*; Commercial Data Servers*, 262 F. Supp. 2d at 63; *Carell v. The Shubert Org.*, 104 F. Supp. 2d 236, 264 (S.D.N.Y. 2000).

"To survive a Rule 12(b)(6) motion to dismiss, an alleged product market must bear a 'rational relation to the methodology courts prescribe to define a market for antitrust purposes – analysis of the interchangeability of use or the cross-elasticity of demand, and it must be

plausible." *Todd*, 275 F.3d at 200 (internal citation omitted). Determining the relevant market is

the same consideration in claims for violations of the Sherman Act and the Clayton Act. *See*

*Standard Oil*, 337 U.S. at 314; *Todd*, 275 F.3d at 200; *Commercial Data Servers*, 262 F. Supp. 2d

at 63.

Frequently, it is the situation that an antitrust claim is dismissed because the pleading

failed to even "attempt a plausible explanation as to why a market should be limited in a

particular way." *See Todd*, 275 F.3d at 200. Where a pleading alleges a proposed relevant market

that "clearly does not encompass all interchangeable substitute products even when all factual

inferences are granted . . . the relevant market is legally insufficient." *City of N.Y. v. Group*

*Health Inc.*, 649 F.3d 151, 155 (2d Cir. 2011). Plaintiff's pleading in this case falls into this

category. Plaintiff's complaint presumably identifies the product line to be "bottles of

noncarbonated unflavored still natural spring water."[5] *See* Dkt. No. 15 at ¶ 12. It further states

that the market for this type of bottled water is "discreet and identifiable, with cross-elasticity of

demand among interchangeable substitute products." *See id*. at ¶ 13. It is further described in the

complaint that the bottled water produced by Plaintiff and Defendant are interchangeable

products. *See id.* at ¶¶ 17-19.

Upon review of the complaint, the Court concludes that the product line in this case, as

pleaded, does not have any plausible basis. Despite identifying the product as bottled spring

water, Plaintiff does not reference the product market in its exclusive dealings claims beyond the

bottled water produced by Plaintiff and Defendant. It is stated in the complaint that Plaintiff, and

then Defendant, both bottled water under the Walmart brand in the past, *see id*. at ¶ 21, but the

---

[5] Although the complaint does identify different sizes of bottled water, it is never clear
whether all the sizes of bottled water are part of the product market. *See* Dkt. No. 15 at ¶¶ 14-15.

product market, as referenced in the complaint, does not include other brands of bottled water despite this allegation of co-packaging for other brands of bottled water.

Moreover, in its complaint, Plaintiff identifies that "all bottled water serves the same purpose of quenching thirst." *See id*. This use does not support limiting Plaintiff's product market to just "noncarbonated unflavored still natural spring water." *See id.* at ¶ 13. Defendant argues that, under Plaintiff's definition that "water is water," *see id.* at ¶ 18, there is no plausible basis why other types of bottled water are not part of the relevant product market, such as filtered water, distilled water, purified water, artesian water, and mineral water. *See* Dkt. No. 23-3 at 26. The Court agrees with Defendant that Plaintiff's relevant market is under-inclusive pursuant to its own defining characteristics of its bottled water because it clearly does not encompass all interchangeable substitute products.

Further, as part of the relevant market, a plaintiff must also plead a geographic market. *See Tampa*, 365 U.S. at 327; *Smugglers Notch Homeowners' Ass'n, Inc. v. Sumgglers' Notch Mgmt. Co.*, 414 Fed. Appx. 372, 375-76 (2d Cir. 2011). Without identifying the geographic boundaries of the product market, a complaint fails to state a cause of action. *See Commercial Data Servers, Inc.*, No 00CIV5008(CM)(LMS), 2002 WL 1205740, *4 (S.D.N.Y. Mar. 15, 2002). "The geographic market encompasses the geographic area in which purchasers of the product can practicably turn for alternative sources of the product." *In re Aluminum Warehousing Antitrust Litig.*, ___ F. Supp. 3d ___, ___, No. 13-md-2481, 2015 WL 1378946, *25 (S.D.N.Y. Mar. 26, 2015). Any barriers in sales transactions due to a different location or a consumer's preferences for travel and price are some factors that are considered in a geographic market. *See id*. "The geographic market for 'goods sold nationwide is often the entire United States, though it need not

be if purchasers cannot practicably turn to areas outside their own area for supply of the relevant product.'" *Id.* (quoting *Standard Oil*, 337 U.S. at 299 n.5).

After careful review of the complaint, the Court finds that Plaintiff's alleged geographic market is also legally insufficient. Plaintiff initially claims that the geographic market is the sale of "bottled water" in five northeastern states where the parties compete to supply water to retail outlets. *See* Dkt. No. 15 at ¶ 16. Plaintiff does not provide any plausible basis for the selection of these five states. In fact, Plaintiff concedes that some of the market shares alleged in the complaint do not account for all sales of bottled water in every retail outlet and do not account for the sales of bottled water in every state where the two companies compete. *See id.* at ¶ 46. In this case, Plaintiff has not attempted to give any explanation as to why the geographic market should be limited to these five states. Because its failure to sufficiently state a product market and geographic market, Plaintiff's section 3 claim is dismissed.

### 5. The Donnelly Act

Plaintiff's fourth claim alleges that Defendant violated section 340 of the New York General Business Law, also known as the Donnelly Act (the "Donnelly Act"). *See* Dkt. No. 15 at ¶¶ 62-64. Presumably, Plaintiff is alleging that Defendant's payments/discounts to Stew Leonard and Dave's Markets in exchange for not purchasing Plaintiff's product were agreements that unlawfully restrained competition in violation of the state statute. New York modeled the Donnelly Act after the Sherman Act, and the New York Court of Appeals has held that the state antitrust claims should be construed in light of federal precedent.[6] *See X.L.O. Concrete Corp. v. Rivergate Corp.*, 83 N.Y.2d 513, 518 (1994) (citing *People v. Rattenni*, 81 N.Y.2d 166, 171 (1993)); *Anheuser-Busch, Inc. v. Abrams*, 71 N.Y.2d 327, 335 (1988). Accordingly, the Donnelly

---

[6] Plaintiff does not maintain a separate claim for a violation of the Sherman Act.

Act is governed by the Sherman Act standards. *Assocs. Capital Servs. Corp. of N.J. v. Fairway Private Cars, Inc.*, 590 F. Supp. 10, 13 (1982) (citing *State v. Mobil Oil Corp.*, 38 N.Y.2d 460, 461 (1976).

In order to sufficiently plead a claim under the Donnelly Act, the Sherman Act, and section three of the Clayton Act, a "'plaintiff must allege a relevant product market in which the anti-competitive effects of the challenged activity can be assessed.'" *Commercial Data Servs. v. Int'l Bus. Mach. Corp.*, No. 00CIV5008, 2002 WL 1205740, *4 (S.D.N.Y. Mar. 15, 2002) (quoting *Carrell*, 104 F. Supp. 2d at 264); *see also Tampa*, 365 U.S. at 325-26. The claims being alleged under the Donnelly Act are the same as Plaintiff's claims underlying its alleged violation of section 3 of the Clayton Act. Because the Court found that the relevant market, as alleged by Plaintiff in the complaint, does not have any plausible basis and, thus, is legally insufficient to support Plaintiff's claimed violation of section 3 of the Clayton Act, the Court likewise finds that Plaintiff's claim for violations under the Donnelly Act also fails for the same reasons. The failure to sufficiently plead a relevant market is just as fatal to Plaintiff's claim under the Donnelly Act as it is to Plaintiff's claim under the section 3 of the Clayton Act. *See City of N.Y. v. Group Health, Inc.*, No. 06 Civ. 13122, 2010 WL 2132246, *2; *Commercial Data Servs.*, 262 F. Supp. 2d at 78 (S.D.N.Y. 2003); *see also Tampa Elec. Co.*, 365 U.S. at 325-26.

### 6. Tortious Interference with Prospective Business Relations

Plaintiff's fifth cause of action is for tortious interference with prospective business relations in violation of New York common law. *See* Dkt. No. 15 at ¶¶ 65-66. Plaintiff claims that Defendant schemed to take its business and convert its customers by disclosing to several supermarkets that Plaintiff was considering selling out the business to Defendant in the face of financial difficulties. *See* Dkt. Nos. 15 at ¶¶ 65-66; 25 at 9. To state a claim for tortious

interference with prospective business relations, the plaintiff must allege: "(1) business relations with a third party, (2) the defendant's interference with those business relations, (3) the defendant acted with the sole purpose of harming the plaintiff or used dishonest, unfair, or improper means, and (4) injury to the business relationship." *See Excellus Health Plan, Inc. v. Tran*, 287 F. Supp. 2d 167, 177 (W.D.N.Y. 2003) (citing *Nadel v. Play-by-Play Toys & Novelties, Inc.*, 208 F.3d 368, 382 (2d Cir. 2000)).

A claim for tortious interference with prospective business relations "requires more culpable conduct on the part of the interferer" as compared to a defendant in tortious interference with a contract, *see Lane's Floor Coverings, Inc. v. Ardex, Inc.*, No. CV-95-4078, 1996 WL 19182, *3 (E.D.N.Y. Jan. 4, 1996), because "courts are more protective of existing contractual relationships than prospective business relationships." *Excellus Health Plan*, 287 F. Supp. 2d at 177.

The Second Circuit has held that "mere suspicions are inadequate to support a claim for tortious interference with business relations." *Scutti Enters., LLC v. Park Place Entm't Corp.*, 322 F.3d 211, 217 (2d Cir. 2003) (citing *Nadel*, 208 F.3d at 382). Claims for speculative future economic advantage should be dismissed. *See Am. Bldg. Maint. Co. of N.Y. v. Acme Prop. Servs., Inc.*, 515 F. Supp. 2d 298, 316 (N.D.N.Y. 2007)*; Jim Mazz Auto, Inc. v. Progressive Cas. Ins. Co.*, Nos. 08-CV-00494(A)(M), 08-CV-00541(A)(M), 08-CV-00566(A)(M), 08-CV-00583(A)(M), 2009 WL 891837, *6 (W.D.N.Y. Feb. 5, 2009); *Commercial Data Servers., Inc. v. Int'l Bus. Mach. Corp.*, 166 F. Supp. 2d 891, 898 (S.D.N.Y. 2001). A plaintiff "must specify some particular, existing relationship through which plaintiff would have done business but for the allegedly tortious behavior." *See Commercial Data Servers*, 166 F. Supp. 2d at 898 (internal quotation marks and citations omitted).

"A general allegation of interference with customers without any sufficiently particular allegation of interference with a specific contract or business relationship does not state a claim." *Commercial Data Servers, Inc.*, 166 F. Supp. 2d at 898 (internal quotation marks and citations omitted). Accordingly, the failure to identify the specific potential customers or the third-party businesses in the pleading is fatal to a plaintiff's claim. *See Jim Mazz Auto*, 2009 WL 891837, at *6; *Commercial Data Servers, Inc.*, 166 F. Supp. 2d at 898 (dismissing the complaint because pleading that the potential customers were a group of resellers with identifying characteristics was too vague to sustain a tortious interference claim).

In this case, Plaintiff has stated that Defendant interfered with Plaintiff's business relationships by showing "several supermarkets" a letter from Plaintiff indicating financial difficulties. *See* Dkt. Nos. 15 at ¶ 30; 25 at 9. The Court finds that Plaintiff has not sufficiently identified a business relationship or customer by pleading "several supermarkets," and, therefore, the allegations do not rise above mere speculation. Plaintiff's claim for tortious interference with a prospective business relations is dismissed.

### 7. Unfair Competition

Plaintiff's sixth cause of action is for unfair competition under New York common law. *See* Dkt. No. 15 at ¶¶ 67-68. This claim "exists where the defendant (1) misappropriates the skill, expenditures, and labor of the plaintiff, (2) to its own commercial advantage, (3) in bad faith." *Excellus*, 287 F. Supp. 2d at 178-79. Although this claim encompasses "a litany of illegal practices . . . , one element deemed essential to the type of unfair competition claim set forth here is that the defendant has misappropriated the benefit or property right of another for its own commercial advantage." *Winner Int'l v. Kryptonite Corp.*, No. 95 Civ. 247, 1996 WL 84476, *3 (S.D.N.Y. Feb. 27, 1996); *see also Norbrook Lab. Ltd. v. G.C. Hanford Mfg. Co.*, 297 F. Supp. 2d

463, 491 (N.D.N.Y. 2003) ("[T]he gravamen of a claim of unfair competition is the bad faith misappropriation of a commercial advantage belonging to another.").  The function of this tort is to "protect property rights of value . . . from any form of commercial immorality."  *See Norbrook*, 297 F. Supp. 2d at 491 (internal citations omitted).

Plaintiff claims that Defendant accessed confidential and proprietary information – specifically its financial data – pursuant to the non-disclosure agreement, and then wrongly used and disclosed this information to cause damage to Plaintiff.  *See* Dkt. Nos. 15 at ¶¶ 25, 30-31, 67-68; 25 at 10-11.  Whether the financial information allegedly taken and disclosed by Defendant constitutes a property right or trade secret is ordinarily a question of fact, *see Ashland Mgmt. Inc. v. Altair Investments NA, LLC*, 59 A.D.3d 97 (1st Dep't 2008), but, however, where the parties have entered into a confidentiality agreement, the information can be treated as a trade secret, even if the information did not independently rise to the level of a trade secret.  *See Paz Sys., Inc. v. The Dakota Group Corp.*, 514 F. Supp. 2d 402, 408 (E.D.N.Y. 2007) (finding that, by gaining information from the plaintiff via their confidential relationship, the defendants "incurred a duty not to use it to [the] plaintiff's detriment") (citing *Panther Sys. II, Ltd. v. Pather Comput. Sys., Inc.*, 783 F. Supp. 53 (E.D.N.Y. 1991)).

Where a relationship of trust is abused by the misappropriation and exploitation of confidential information for commercial business, the courts have found this to be unfair competition even if the confidential information would not alone rise to the level of a trade secret. *See Paz Sys., Inc.*, 514 F. Supp 2d at 409; *Ecolab Inc. v. Paolo*, 753 F. Supp. 1100, 1111 (E.D.N.Y. 1991); *Allan Dampf, P.C. v. Bloom*, 127 A.D.2d 719, 719 (2d Dep't 1987).  In this case, the financial data that was allegedly obtained pursuant to a non-disclosure agreement and

then unlawfully disclosed by Defendant for its commercial benefit plausibly states a claim for unfair

competition.

### 8. Breach of Contract

Defendant moves to dismiss Plaintiff's seventh claim for breach of contract. *See* Dkt. No. 23-3 at 23-25. According to Defendant, Plaintiff has failed to state a claim for which relief can be granted under Delaware law, the applicable law to the contract. *See id.* Defendant submits that Plaintiff's pleading alleges speculative and unforeseeable consequential damages that are not available under the applicable law. *See id.* Although a court's review of a motion to dismiss is generally limited to the facts presented in the pleading, the court may consider documents that are "integral" to that pleading, even if they are neither physically attached to, nor incorporated by reference into, the pleading. *See Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002)). The Court has reviewed the contract at issue even though it was not attached to the complaint.

"A federal court sitting in a diversity case applies the choice of law rules of the forum state." *Dessert Beauty, Inc. v. Platinum Funding Corp.*, 519 F. Supp. 2d 410, 418-19 (S.D.N.Y. 2007); *see also Fin. One Pub. Co. v. Lehman Bros. Special Fin., Inc.*, 414 F.3d 325, 331 (2d Cir. 2005). "The validity of a contractual choice-of-law clause is a threshold question that must be decided not under the law specified in the clause, but under the relevant forum's choice-of-law rules governing the effectiveness of such clauses." *See Fin. One Pub.*, 414 F.3d at 332. In New York, "absent fraud or violation of public policy, contractual selection of governing law is generally determinative so long as the State selected has sufficient contacts with the transaction." *Hawes Office Sys. v. Wang Labs., Inc.*, 537 F. Supp. 939, 942 (E.D.N.Y. 1982). At this time, the

Court declines to make a definitive finding that Delaware Law applies to the non-disclosure agreement in this action. *See Speedmark Transp., Inc. v. Mui*, 778 F. Supp. 2d 439, 444 (S.D.N.Y. 2011) (finding that the choice-of-law determination was premature at the motion to dismiss stage) (collecting cases).

However, even assuming for purposes of this motion only that Delaware law applies to the breach of contract claim, the Court finds that Plaintiff has plausibly stated a claim. "In order to survive a motion to dismiss for failure to state a breach of contract claim, the plaintiff must demonstrate: first, the existence of the contract. . . ; second, the breach of an obligation imposed by that contract; and third, the resultant damage to the plaintiff." *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003); *see also Greenstar, LLC v. Heller*, 814 F. Supp. 2d 444, 450 (D. Del. 2011). "Recovery is limited to those damages that arise naturally from the breach or that were reasonably foreseeable at the time the contract was made." *Tackett v. State Farm Fire and Cas. Ins. Co.*, 653 A.2d 254, 265 (Del. 1995).

According to the complaint, there was a valid non-disclosure agreement between Plaintiff and Defendant, *see* Dkt. No. 15 at ¶ 24, Defendant breach the terms of this agreement by disclosing to third-party retailers that Plaintiff was looking to sell out due to financial difficulties, *see id.* at ¶ 30, and this disclosure, in violation of the contract, caused wholesale buyers to refuse to purchase from Plaintiff out of fear that Plaintiff would be unable to deliver their product and that these purchasers would be able to buy Plaintiff's product from Defendant at a reduced price. *See id.* at ¶ 31. Contrary to Defendant's contention, there is not a heightened pleading requirement for proximate cause in a breach of contract claim in Delaware. Plaintiff has plausibly alleged damage that was proximately cause by Defendant's breach of the non-disclosure agreement. The Court finds that Plaintiff has sufficiently stated a claim for breach of contract.

# IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Defendant's motion to dismiss pursuant to section 12(b)(6) of the Federal Rules of Civil Procedure (Dkt. No. 23) is **GRANTED** with regard to Plaintiff's claims for

1. violation of section 2(a) of the Robinson-Patman Act, 15 U.S.C. § 13(a),

2. violation of section 2(c) of the Robinson-Patman Act, 15 U.S.C. § 13(c),

3. violation of section 3 of the Clayton Act, 15 U.S.C. § 14,

4. violation of the New York Donnelly Act, N.Y. General Business Law § 340, and

5. New York common law claim for tortious interference; and the Court further

**ORDERS** that Defendant's motion to dismiss pursuant to section 12(b)(6) of the Federal Rules of Civil Procedure (Dkt. No. 23) is **DENIED** with regard to Plaintiff's claims for

1. New York common law claim for unfair competition, and

2. New York common law breach of contract; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: August 10, 2015
　　　　Albany, New York

Mae A. D'Agostino
U.S. District Judge